UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------

| | |
|---|---|
| SHOLOM KELLER,<br><br>                Plaintiff,<br><br>      v.<br><br>CHEMBIO DIAGNOSTICS, INC.,<br>KATHERINE L. DAVIS, JOHN G.<br>POTTHOFF, DAVID W.K. ACHESON,<br>DAVID W. BESPALKO, RICHARD L.<br>EBERLY, LESLIE TESO-LICHTMAN, and<br>LAWRENCE J. STEENVOORDEN.<br><br>                Defendants. | Case No. 1:23-cv-01388<br><br>**COMPLAINT FOR VIOLATIONS OF SECTIONS 14(d), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br><u>**JURY TRIAL DEMAND**</u> |

<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

Plaintiff Sholom Keller ("Plaintiff"), by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.

<u>**NATURE OF THE ACTION**</u>

1.      This action is brought by Plaintiff against Chembio Diagnostics, Inc. ("Chembio" or the "Company") and the members of the Company's board of directors ("Board") for violations of (i) Sections 14(d), 14(e) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(d), § 78n(e) and § 78t(a), and (ii) 17 CFR § 240.14d-101. Plaintiff's claims arise in connection with the Board's recommendation that the stockholders of the Company ("Chembio Stockholders") tender their shares to an affiliate of Biosynex SA, ("Biosynex"), pursuant to a tender offer ("Tender Offer") to acquire all of the issued and outstanding shares of Chembio for

$0.45 in cash per share ("Merger Consideration").

2.      On January 31, 2023, Chembio and Biosynex announced that they had entered into an agreement ("Merger Agreement") providing for Biosynex to purchase all of the outstanding shares of Chembio for the Merger Consideration via the Tender Offer.

3.      On February 14, 2023, Biosynex commenced the Tender Offer by filing a Tender Offer Statement on Schedule TO ("TO Statement") with the SEC. The TO Statement provides that the Tender Offer expires one minute after 11:59 P.M. Eastern Time on March 14, 2023 ("Expiration Date"), unless extended or earlier terminated in accordance with the Merger Agreement. Upon satisfaction of various conditions described in the TO Statement, and consummation of the Tender Offer, Chembio will survive as a wholly-owned subsidiary of Biosynex under Nevada law pursuant to a series of merger transactions ("Merger").

4.      On February 14, 2023, Defendants filed a materially false and misleading Schedule 14D-9 Solicitation/Recommendation Statement ("Recommendation Statement") with the SEC recommending that Chembio Stockholders tender their shares to Biosynex pursuant to the Tender Offer. As detailed below, the material misrepresentations and omissions in the Recommendation Statement render it false and misleading in violation of the above-referenced Exchange Act provisions.

5.      It is imperative that such violations are promptly cured to enable Chembio Stockholders to make an informed decision concerning whether to tender their shares to Biosynex before the Expiration Date.  Therefore, Plaintiff seeks to enjoin Defendants from closing the Tender Offer and/or taking any steps to consummate the Merger, until such violations are cured. Alternatively, if the Tender is closed and the Merger is consummated, Plaintiff reserves the right to recover damages suffered by himself and similarly-situated investors as a result of such

violations.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(d), 14(e) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

7.      This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.").

8.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District. In particular, Chembio's common stock trades under the ticker "CEMI" on Nasdaq, which is headquartered in this District, and the false and misleading Recommendation Statement was filed with the SEC, which has a regional office in this District. *See Mariash v. Morrill*, 496 F.2d 1138, 1144 (2d Cir. 1974) (venue appropriate in the Southern District of New York where an

act or transaction constituting the alleged violation occurred in the Southern District of New York); *United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (venue in tender offer fraud prosecution appropriate in District).

## **PARTIES**

9. Plaintiff is, and has been at all relevant times, a continuous stockholder of Chembio stock.

10. Defendant Chembio is a Nevada corporation with its principal executive offices located at 3661 Horseblock Road, Medford, New York 11763.

11. Defendant Katherine L. Davis has been Chair of the Board and served as a director of the Company at all relevant times.

12. Defendant John G. Potthoff, Ph.D., has served as a director of the Company at all relevant times.

13. Defendant David W.K. Acheson, M.D., has served as a director of the Company at all relevant times.

14. Defendant David W. Bespalko has served as a director of the Company at all relevant times.

15. Defendant Richard L. Eberly currently serves as the President and Chief Executive Officer ("CEO") of the Company, and has served as a director of the Company at all relevant times.

16. Defendant Leslie Teso-Lichtman has served as a director of the Company at all relevant times.

17. Defendant Lawrence J. Steenvoorden currently serves as the Company's Chief Financial Officer. Defendant Steenvoorden personally signed the Recommendation Statement.

18.     Defendants identified in paragraphs 11 to 17 are collectively referred to herein as the "Individual Defendants," and together with Chembio, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Background

19.     Chembio develops and commercializes rapid, easy to use, and reliable point of care diagnostic tests that improve detection and monitoring of various diseases. In February 2020, the Company began the process of shifting substantially all of its resources to address the need for diagnostic testing for COVID-19, and by March 2020, the Company had developed, and begun to manufacture for commercialization, the DPP COVID-19 System, which consisted of the Company's new serological test for COVID-19.

### Background to the Merger With Biosynex

20.     On April 22, 2022, at a meeting of the Board, one of the Company's financial advisors, Craig-Hallum Capital Group LLC ("Craig-Hallum"), recommended the Company pursue a strategic sales process in light of ongoing regulatory, operational and liquidity challenges. Craig-Hallum reviewed a list of potential acquirers. After hearing Craig-Hallum's recommendations, the Board decided to retain Craig-Hallum to pursue a potential sale or other strategic transaction (which the Board referred to as "Project Cheetah").

21.     During May 2022, Craig-Hallum engaged in broad outreach to potential strategic partners for the Company that Craig-Hallum viewed as most likely to be interested in and able to engage in a possible strategic transaction with the Company. Defendant Eberly solicited input from and provided the members of the Board and the Business Strategy Committee of the Board (the "Strategic Committee") with periodic updates regarding Project Cheetah throughout the process. Following Craig-Hallum's initial outreach, the Company entered into confidentiality and non-

disclosure agreements ("NDAs") with three potential acquirers on May 25, 2022, including Biosynex.

22.     During the week of June 27, 2022, members of the Company's management met with Biosynex to discuss the operational benefits associated with a potential transaction.

23.     On July 19, 2022, Craig-Hallum informed the Strategic Committee that Biosynex was not interested in pursuing an acquisition of the Company at the time, but was preliminarily considering a potential purchase of or investment in the Company's wholly-owned German subsidiary, and a license agreement for the Company's DPP technology.

24.     On November 8, 2022, the Company and Party A entered into a non-binding term sheet for the acquisition of the Company by Party A (the "Party A Non-Binding Term Sheet") in a one step merger transaction. The Party A Non-Binding Term Sheet contemplated the acquisition of all of the outstanding shares of the Company for an initial price of $0.42 per share to be reduced by certain sums. The Company preliminarily estimated that the Company's stockholders would potentially receive between $0.20 and $0.30 per share in connection with such transaction depending upon the timing of closing and the actual amount of the reductions. The Party A Non-Binding Term Sheet also included a 30-day exclusivity period.

25.     During the week of November 28, 2022, however, Party A advised the Company that it no longer wished to pursue a one-step merger transaction as originally contemplated, and demanded interim commercial arrangements in advance of any potential transaction.

26.     On December 8, 2022, following the expiration of the Company's exclusivity with Party A, the Company's senior management contacted Biosynex to discuss a potential strategic transaction.

27.     On December 15, 2022, following further discussion between the parties, Biosynex

sent the Company a non-binding term sheet providing for the acquisition of the Company for between $0.40 and $0.45 per share in cash.

28.     Later on December 15, 2022, the Company advised Party A that the Company was not interested in proceeding with any sort of interim commercial arrangements followed by a potential acquisition of the Company, but that it would be interested in a possible sale transaction at $0.42 per share with no adjustments. Party A never responded to such proposal.

29.     On December 16, 2022, the Company executed the non-binding term sheet with Biosynex providing for the acquisition of the Company for between $0.40 and $0.45 per share in cash through a tender offer for a majority of the outstanding shares followed by a short-form merger under Nevada law. The term sheet contained an exclusivity period until January 31, 2023.

30.     On January 27, 2023, after further discussions between the Company and Biosynex, and due diligence by Biosynex, the Company and Biosynex agreed to a price of $0.45 per share in cash.

31.     On January 31, 2023, Craig-Hallum provided its opinion ("Fairness Opinion") to the Board that the Merger Consideration was fair from a financial point of view to Chembio Stockholders. The Board thereafter unanimously determined that the Merger and related transactions were in the best interests of the Company and its stockholders, and resolved to recommend that Chembio Stockholders tender their Shares to Biosynex pursuant to the Tender Offer.

32.     On January 31, 2023, the Company and Biosynex issued a joint press release announcing the transaction.

**The Recommendation Statement Contains Material Omissions That**
**Render Statements Therein Misleading**

33.     Defendants disseminated a false and misleading Recommendation Statement to Chembio Stockholders that misrepresents or omits material information that is necessary for Chembio Stockholders to make an informed decision concerning whether to tender their shares to Biosynex pursuant to the Tender Offer.

*__Material Nondisclosures Concerning Preparation of the Projections__*

34.     When itemizing the reasons that the Board recommended that Chembio Stockholders tender their shares, the Recommendation Statement states that the "Board considered ***certain financial projections*** for the Company prepared by the Company's management, which reflected certain assumptions of the Company's management." The Recommendation Statement further states that "in connection with the Company's 2022 strategic planning process, [Biosynex's] due diligence process, and the Company Board's evaluation of the Offer, the Merger Agreement and the Transaction, the Company's senior management prepared financial projections for fiscal years 2023 through 2027 (the "Projections"). These Projections were provided to the Company Board, Craig-Hallum and [Biosynex] in preparation for their analysis and evaluation of the Company and its businesses."

35.     The Proxy fails to disclose, however, *when* (i) the Company's management prepared the Projections, (ii) such Projections were presented to the Board for review and approval, and (iii) the Board approved the Projections for use by Craig-Hallum in connection with preparing the Fairness Opinion. While the Recommendation Statement states that the Projections were "initially prepared in connection with the Company's 2022 strategic planning process," the narrative in the "Background of the Offer" section of the Recommendation Statement fails to identify at what point during the strategic planning process the Projections were prepared. As such,

the inference arises that the Projections may have been prepared in close proximity to preparation of the Fairness Opinion by Craig-Hallum, and thus that the Projections were created solely to justify the fairness of the Merger Consideration, and did not accurately represent the standalone prospects of the Company.

36.    Supporting the inference that the Projections did *not* accurately represent the standalone prospects for the Company is an estimate in the Projections of $31.4 million in revenue for **the entire 2023**. Yet, on the Company's Q3 2022 earnings call held on November 6, 2022, Defendant Steenvoorden reported total revenue of **$11.2 million** for the **three months ended September 30, 2022 alone**. In response, Per Ostlund, an analyst at Craig-Hallum, stated:

> ***I'm going to start out with the Q3 revenue number. Candidly, I was pleasantly surprised here.*** I had been sort of – while not officially having an estimate, we have talked and you've talked about the second half being lighter than the first half. And I kind of assume that with a couple of contracts being fulfilled earlier in the year that, we would see a sequential step down***. So I was happy to see that number be so strong here in the quarter. Was there anything unusual as far as a bolus of order stocking order somewhere that wouldn't otherwise recur, or was this simply a function of the growing depth of product and geography that you are – you have at your disposal?***

37.    Defendant Eberly responded that the strong revenue numbers in Q3 2022 reflected successful implementation of a strategy to diversify the Company's business in multiple regions, including "tremendous growth in the United States" and "good contribution from Europe":

> ***Yeah, Per. Thank you for that question, and I'm glad you were happily surprised. As we've talked over the last several quarters, our strategy has really been to diversify the business by region and by product, it become less dependent on large government tenders, or large government orders, whether they come from Brazil, as we've experienced over the last year or Global Fund countries in Africa. So this quarter, I think was a good indication that we're getting good balanced revenue from tremendous growth in the United States from our sales team and the investment we've made in the US***.
>
> South America same thing. Our balanced attack in Brazil now is beyond COVID. We're focused on our core products in Brazil. And our strategy in Brazil is multifaceted. Not dependent upon the government or Ministry of Health or Bio-

Manguinhos. We now have a retail strategy, where our pharmacy partners are now selling our SURE CHECK HIV self-test online on their websites, as well as an e-commerce platform we've set up. So that's a retail strategy. Our other strategy in Brazil is now going out to the states and local, areas like Rio and Sao Paulo, to work with the state and city governments, where they're putting together programs, as well for rapid testing.

And then we're going into the traditional markets in Brazil as well through our distribution partner in Brazil, who calls on hospitals and clinics and so forth throughout the country. So I would say, it's a balanced approach strategically. We continue to maintain excellent relationships, with the Ministry of Health, as well as Bio-Manguinhos in Brazil. So we're working with them on a well-detailed forecast for 2023.

And then over to Europe. I think we're beginning to see, the fruits of a strong investment in our distribution partner in France, who now is in almost every Western European country in 35,000 pharmacies with our HIV SURE CHECK products. They're launching into new Eastern European countries. We're talking about a Middle East strategy, as well for that product. ***So we're getting good contribution from Europe.***

And then in the UK, we've invested time and energy with our distribution partner in the UK, to get Amazon up and running as well as the Boots Pharmacy. It's now on the shelf in the UK through our pharmacy partner in the UK. ***So I think it's a long-winded answer Per, but I think we're beginning to see a really good distribution of product revenue in our core products, as well as by regions around the world where in the history of Chembio, they were largely focused on Africa and Southeast Asia, where there's tremendous pricing pressure, tremendous competition from the South Asian manufacturers of rapid tests. So that's where we're at***.

38.    Additionally, the Proxy itself states that on "November 3, 2022, the Company issued a press release in which it reported revenues of ***approximately $39.2 million*** and a net loss of approximately $22.4 million ***for the nine months ended September 30, 2022***." Thus, the reported revenue in the nine months ended September 30, 2022, is approximately 25% higher than the revenue projected for the entire 2023 in the Projections.

39.    In sum, in order to weigh for themselves the credibility of the Projections used by Craig-Hallum to prepare the Fairness Opinion when deciding whether to tender their shares, Chembio Stockholders are entitled to disclosure concerning (i) when during the strategic planning

process the Projections were prepared by Company management, and (ii) when during the strategic planning process the Projections were reviewed and approved by the Board for use by Craig-Hallum in preparing the Fairness Opinion. Absent such disclosure, the inference arises that the Projections represent depressed estimates created not in the ordinary course of business, but solely for the purpose of justifying the fairness of the Merger Consideration.

### *Material Nondisclosures Concerning the Strategic Committee*

40.     The Recommendation Statement discloses that during May 2022, "Mr. Eberly solicited input from and provided the members of the Company Board and the Business Strategy Committee of the Company Board (the "Strategic Committee") with periodic updates regarding Project Cheetah throughout the process." The Recommendation Statement further discloses that through July 19, 2022, Craig-Hallum updated the Strategic Committee concerning its outreach to counterparties for a potential transaction.

41.     The Recommendation Statement does not disclose, however (i) the members of the Strategic Committee, (ii) whether the formation of the Strategic Committee was prompted by a potential conflict, (iii) what powers were granted to the Strategic Committee by the Board in connection with review of potential transactions, and (iv) whether the members of the Strategic Committee were paid any compensation in connection with their service on the Strategic Committee. Such disclosure is necessary to determine (i) the nature of the potential conflict, if any, that prompted the formation of the Strategic Committee, (ii) whether the Strategic Committee at any point exceeded its powers in connection with the performance of its work, (iii) any potential conflicts of the members of the Strategic Committee, and (iv) whether the compensation, if any, paid to members of the Strategic Committee created a potential conflict. Additionally, the Proxy discloses that Craig-Hallum last presented to the Strategic Committee on July 19, 2022, but then

fails to disclose whether the Strategic Committee was subsequently disbanded, and if so, for what reason.

### Material Nondisclosures Concerning the Craig-Hallum Fairness Opinion

42. A financial advisor's fairness opinion is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders. In particular, when a financial advisor's endorsement of the fairness of a transaction is touted to stockholders, not just the analyses used by that advisor to arrive at the fairness opinion, but also the key inputs and assumptions used in those analyses must be fairly disclosed.

43. Here, the Fairness Opinion of Craig-Hallum improperly failed to disclose certain key inputs and assumptions underlying the analyses on which it was based, which renders it misleading. Without this information, as described below, Chembio Stockholders are unable to fully understand Craig-Hallum's analyses and, thus, are unable to determine what weight to place on the Fairness Opinion in deciding whether or not to tender their shares. This omitted information, if disclosed, would significantly alter the total mix of information.

44. With respect to Craig-Hallum's *Analysis of Comparable Publicly Traded Companies*, the Recommendation Statement states:

> Craig-Hallum reviewed and compared certain publicly available financial data, ratios and trading multiples for **six comparable publicly traded companies** that Craig-Hallum determined, based on its professional judgment, to be reasonably comparable to the Company. **The comparable publicly traded companies Craig-Hallum selected were Biosynex SA, Co-Diagnostics, Inc., Lucira Health, Inc., Lumos Diagnostics Holdings Limited, OraSure Technologies, Inc., and Trinity Biotech plc.** Although none of the six selected publicly traded companies are directly comparable to the Company, Craig-Hallum reviewed these companies because, among other things, Craig-Hallum determined that their businesses, financial information, service offerings, and operating profiles are reasonably comparable to those of the Company for purposes of this analysis. In selecting comparable public companies, **Craig-Hallum focused on healthcare diagnostic companies focused on infectious diseases with enterprise values below $500 million.** Financial data of the selected companies was based on publicly available

information such as public filings and third-party equity research reports. ***Craig-Hallum reviewed data, including stock price, market capitalization, enterprise value, gross margin percentage, and revenue multiples based on the last 12 months revenues, estimated calendar year 2022 revenues, and estimated calendar year 2023 revenues, for each of the selected publicly traded companies***. The multiples for each of the selected companies were calculated using their respective closing prices on January 27, 2023 and were based on the most recent publicly available information and information collected from S&P Capital IQ. ***The following tables reflects the results of this analysis…***"

45.     Notwithstanding, however, that the "enterprise value" of each of the six companies selected by Craig-Hallum for its *Analysis of Comparable Publicly Traded Companies* was a key input in the multiples disclosed in the table in the Recommendation Statement, Craig-Hallum failed to disclose the "enterprise value" of ***any*** of the six companies selected, or the "EV/LTM Revenue," "EV/2023E Revenue," and "EV/LTM Gross Profit" multiples for ***any*** of the six companies selected. Given that the analysis involved only six companies, the Recommendation Statement should disclose the "enterprise value," and relevant multiples for each of the six companies selected.

46.     Further, when disclosing the "implied equity prices per share" ranges for the Company, the Recommendation Statement fails to disclose how Craig-Hallum (i) derived the "2023E Revenue" for the Company against which the derived multiples were applied (i.e., was it based on the Projections? Analyst estimates?), and (ii) calculated the number of shares of Company common stock used in the "per share" calculations (i.e., as of what date? fully diluted?).[1]

47.     With respect to Craig-Hallum's *Analysis of Comparable M&A Transactions*, the Recommendation Statement states:

---

[1] The Proxy disclosed that, as of February 8, 2023, there were (i) 36,725,858 issued and outstanding Shares, including Shares in respect of vested Company RSUs (as defined below), (ii) 3,657,163 Shares covered by Company Options (as defined below), and (iii) 1,570,779 Shares covered by unvested Company RSUs.

Craig-Hallum performed a precedent transactions analysis, which is designed to imply a value of a company based on publicly available financial terms for selected transactions.

Craig-Hallum reviewed and compared certain publicly available transaction valuation metrics that Craig-Hallum determined, based on its professional judgment, were reasonably comparable to the proposed Merger.

Craig-Hallum reviewed and selected precedent transactions that, in the exercise of its professional judgment, were deemed to have similar characteristics to the Company's business and financial profile that had closed or were announced but had yet to close, since January 1, 2018. *The following tables reflects the results of these analyses with respect to comparable transactions*…"

48.     The table in the Recommendation Statement, however, identifies only *five* comparable transactions. Moreover, the table does not disclose the "EV/Revenue" multiples for *any* of the transactions, or the EVs (i.e., enterprise values) for *any* of the targets in *any* of the transactions. Given that the analysis involved only five comparable transactions, the Recommendation Statement should disclose (i) the EVs for each of the five targets, and (ii) the "EV/Revenue" multiple for each of the five comparable transactions. Finally, the *Analysis of Comparable M&A Transactions* fails to disclose how Craig-Hallum calculated the number of shares of Company common stock used in the "per share" calculations (i.e., as of what date? fully diluted?; *see* footnote 1 *supra*).

49.     With respect to Craig-Hallum's *Discounted Cash Flow Analysis*, the Recommendation Statement also fails to disclose the number of fully diluted shares of Company common stock used in connection with the relevant "per share" calculations. The Recommendation Statement also fails to adequately disclose how Craig-Hallum determined that a discount rate range of 16.0% to 22.0% was appropriate. The explanation in the Recommendation Statement that Craig-Hallum derived that range based on the "estimated weighted average cost of capital" of the

Company is insufficient since it does not disclose the risk free rate, U.S. equity premium, and beta adjustments that Craig-Hallum used.

50.     If the discount rate ranges used by Craig-Hallum were artificially high, it would have depressed the value ranges generated for the Company's shares. *See In re Topps Co. S'holders Litig*., 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). As such, Chembio Stockholders are entitled to further disclosure concerning the inputs that Craig-Hallum used to determine the discount rate ranges. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them."). Such information is material since a discounted cash flow analysis is "arguably the most important valuation metric." *Laborers Loc. 235 Benefit Funds v. Starent Networks, Corp*., No. CIV.A. 5002-CC, 2009 WL 4725866, at *1 (Del. Ch. Nov. 18, 2009).

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(e) of the Exchange Act**

51.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

52.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

53.     Defendants disseminated the Recommendation Statement to Chembio Stockholders recommending that Chembio Stockholders tender their shares to Biosynex in connection with the Tender Offer.

54.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Recommendation Statement, Defendants were aware of their duty not to make false and misleading statements in the Recommendation Statement, and not to omit material facts from the Recommendation Statement necessary to make statements made therein— in light of the circumstances under which they were made—not misleading.

55.     Yet, as specified above, in violation of Section 14(e) of the Exchange Act, Defendants knowingly or recklessly (i) made untrue statements of material fact in the Recommendation Statement, and (ii) omitted material facts from the Recommendation Statement necessary to make statements therein—in light of the circumstances under which they were made—not misleading, in order to induce Chembio Stockholders to tender their shares in the Tender Offer, and thereby maximize their own personal gain by (i) converting their Chembio shares into cash through the immediate sale of all of their Chembio shares for cash, (ii) the immediate conversion of their Chembio equity-based awards into cash, and (iii) the potential receipt of "Change in Control" payments (as detailed in the sections of the Recommendation Statement entitled "Arrangements with Current Executive Officers and Directors of the Company" and "Potential Change in Control Payments to Named Executive Officers").

56.     The material misrepresentations and omissions in the Recommendation Statement specified above are material insofar as there is a substantial likelihood that a reasonable Chembio Stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable Chembio Stockholder would view disclosures of the omitted facts specified above as

significantly altering the "total mix" of information made available to Chembio Stockholders.

57.     Because of the material misrepresentations and omissions in the Recommendation Statement specified above, Plaintiff and other Chembio Stockholders are threatened with irreparable harm insofar as Plaintiff and other Chembio Stockholders will be deprived of their entitlement to make a fully informed decision as to whether to tender their shares in connection with the Tender Offer if such material misrepresentations and omissions are not corrected prior to the Expiration Date. Therefore, injunctive relief is appropriate.

## COUNT II

**Against All Defendants for Violations of Section 14(d) of the Exchange Act
and 17 CFR § 240.14d-101**

58.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

59.     Section 14(d)(4) of the Exchange Act provides that it is unlawful "[a]ny solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(d)(4).

60.     17 CFR § 240.14d-101 (addressing the contents of a Schedule 14D-9 recommendation statement) provides that Item 8 of a recommendation statement shall "[f]urnish the information required by Item 1011(b) *and (c)* of Regulation M-A (§ 229.1011 of this chapter).

61.     17 CFR § 229.1011(c) provides for the furnishing of "additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

62.     As set forth above, Defendants knowingly or recklessly omitted material facts from

the Recommendation Statement necessary to make statements therein—in light of the circumstances under which they were made—not misleading, in order to induce Chembio Stockholders to tender their shares in the Tender Offer, and thereby maximize their own personal gain. Accordingly, Defendants have violated Section 14(d)(4) of the Exchange Act and 17 CFR § 240.14d-101.

## COUNT III

### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

63.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of Chembio within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Chembio, and participation in, and/or awareness of Chembio's operations, and/or intimate knowledge of the contents of the Recommendation Statement filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Chembio with respect to the Recommendation Statement, including the content and dissemination of the various statements in the Recommendation Statement that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

65.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, Defendant Steenvoorden personally signed the Recommendation Statement.

66.     Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Chembio, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Recommendation Statement at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Chembio Stockholders tender their shares pursuant to the Tender Offer. The Individual Defendants were thus directly involved in the making of the Recommendation Statement.

67.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Recommendation Statement.

68.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

69.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d) and Section 14(e), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

70.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that

Defendants' actions threaten to inflict, and can Plaintiff and other Chembio Stockholders make an informed decision about whether to tender their shares pursuant to the Tender Offer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with, consummating, or closing the Merger, unless and until Defendants disclose and disseminate to Chembio Stockholders the material information specified above that has been omitted from the Recommendation Statement, and correct any false and misleading statements in the Recommendation Statement;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages.

C.      Directing Defendant to account to Plaintiff for all damages suffered as a result of their misconduct.

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: February 17, 2023

**WOHL & FRUCHTER LLP**

By: */s Joshua E.  Fruchter*
Joshua E. Fruchter (JF2970)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*